## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

———————

FRANKIE WILLIAMS, KIMBERLY ORD
and MATTHEW DEVINE, on their own
behalf and for all others similarly situated,

      Plaintiffs,

      v.

SECURITAS SECURITY SERVICES USA
INC.,

      Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No. 10-cv-07181

HON. HARVEY BARTLE, III

FILED VIA ECF

## DEFENDANT SECURITAS SECURITY SERVICES USA INC'S
## MEMORANDUM OF LAW IN OPPOSITION TO
## PLAINTIFFS' MOTION FOR CONDITIONAL CERTIFICATION

## ORAL ARGUMENT REQUESTED

# TABLE OF CONTENTS

PAGE

I.   INTRODUCTION ...................................................................................................1

II.  FACTS ...................................................................................................................2

    A.   SUSA's Only "Statewide" Policy Is To Pay For All Time Worked. ...................2

    B.   SUSA's Operations Vary Widely Throughout The State.......................................6

    C.   The Plaintiffs' Claims Differ And Rely On Individualized Facts. ........................6

    D.   There Is No Common Practice Regarding Uniform Maintenance In
        Pennsylvania. ........................................................................................................7

    E.   Plaintiffs Have Shown No Common Practice In Pennsylvania Requiring
        Employees To Violate Company Policy By Working Before Their Shift
        Begins. ................................................................................................................11

    F.   Plaintiffs Have Shown No SUSA Policy That Generally Requires Unpaid
        Training. ..............................................................................................................12

III. ARGUMENT.......................................................................................................13

    A.   Legal Standard:  To Be "Similarly Situated," Plaintiffs Must Submit Facts
        Showing That Their Claims Can Be Resolved By Common Proof. ....................13

    B.   Plaintiffs Have Failed To Meet Their Burden That They Are Similarly
        Situated With Respect To Any Of The Claims Alleged Here. ............................16

        1.   Plaintiffs Have Failed To Make A Modest Factual Showing That
            The Uniform Maintenance Claim Is Susceptible To Common
            Proof. ......................................................................................................16

        2.   Plaintiffs Have Failed To Make A Modest Factual Showing That
            The Pre-Shift Work Claim Can Be Resolved Based On Common
            Proof. ......................................................................................................20

        3.   Plaintiffs Have Failed To Make A Modest Factual Showing That
            They Are Similarly Situated To Anyone With Respect To Training
            Time.........................................................................................................23

IV.  CONCLUSION ...................................................................................................25

## I.    INTRODUCTION

The history of this litigation is important.   In May of 2008, the firm representing Plaintiffs in this case filed an action in Illinois against defendant Securitas Security Services USA ("SUSA") claiming unpaid wages and overtime for alleged off-the-clock work under the Fair Labor Standards Act ("FLSA").   At that time, the District Court "conditionally certified" the case under the lenient standard often used in cases where little discovery has occurred.   Three years later, after massive discovery (including production of hundreds of thousands of pages of documents) and incurring nearly $2 million in defense costs, the case is not close to trial, and a motion for decertification is pending before the District Court in Chicago.[1]

Two and a half years later, in December 2010, Plaintiffs' counsel filed this action, then took over three months to serve it.   Now, after over six months, and over three years after Plaintiffs' counsel first alleged that SUSA had a policy to fail to pay employees, Plaintiffs bring this motion.   Plaintiffs repeatedly urge the Court to apply an "extraordinarily lenient" standard, and issue notice because the putative class' claims might be extinguished by the statute of limitations.   (Pl. Mot. at 2, 13-14).   However, *all of the putative collective action members' claims* as they existed when counsel for the Plaintiffs first raised these off-the-clock allegations against SUSA are already barred.

Time waits for no man, and especially not for litigants.   If there ever was a basis to claim that SUSA policies required, allowed, or even failed to forbid, working "off the clock," such a policy *certainly* does not exist within the past three years (*see* Section II(A), *infra*).   Absent such a policy, Plaintiffs' lawsuit is nothing more than allegations of various alleged *violations* of SUSA's policies.   As will be shown below, no single case can be made of such violations, certainly not one encompassing hundreds of client worksites and thousands of employees.

---

[1] *Howard  v. Securitas Security Services USA, Inc.*, N.D. Ill. 1:08-cv-02746.

Plaintiffs' burden in this motion is to show that they are "similarly situated" to absent collective action members. Plaintiffs utterly fail to meet their burden here. Each Plaintiff submits a threadbare declaration devoid of sufficient detail to even make out a claim for a single violation of the FLSA, much less to show that they are similarly situated to anyone else. The fact section of their brief consists of assertions unsupported by any record evidence.[2]

Plaintiffs' *pro forma* motion also fails to explain how any trial could resolve the individualized claims and defenses by any common proof or formula. This case would require hundreds, if not thousands of mini-trials or a trial in which the parties speculate over how and why the Company's policies allegedly were not followed in a variety of settings. However, the Supreme Court has recently clarified that a trial cannot be structured that would prevent SUSA from presenting statutory defenses to statutory claims:

> Once a plaintiff establishes a pattern or practice of discrimination, a district court must usually conduct "additional proceedings . . . to determine the scope of individual relief." *Teamsters v. United States*, 431 U. S. 324, 361. The company can then raise individual affirmative defenses and demonstrate that its action was lawful. *Id.*, at 362. The Ninth Circuit erred in trying to replace such proceedings with Trial by Formula.

*Wal-Mart Stores, Inc. v. Dukes,* __ U.S. __, 2011 U.S. LEXIS 4567, *49-50 (June 20, 2011). Plaintiffs have failed to meet their burden that their claims can be resolved based on common proof, and the Court should deny conditional certification. Plaintiffs, or anyone else, can pursue any individual claims that they might have and are in no way prejudiced by such a ruling.

## II.     FACTS

### A.     SUSA's Only "Statewide" Policy Is To Pay For All Time Worked.

Plaintiff's motion alleges that SUSA maintains "standardized policies, time keeping

---

[2] Plaintiffs' brief is so riddled with factual assertions with no record support, that an annotated version of it, with unsupported facts stricken is attached as Exhibit A to the Keon Declaration filed herewith. (Keon Decl., ¶3 & Ex. A).

practices and pay rates" for its employees, but fails to identify or discuss them or make an argument that they are unlawful. (Pl. Mem. at 4). This is understandable perhaps, because SUSA's "standardized" policies are completely lawful.

SUSA provides every security officer with a pocket-sized Security Officer Handbook (the "Handbook") that summarizes the major policies and procedures governing their employment. (Lanius Decl., ¶4 & Exs. A, B and C). SUSA updates the Handbook periodically. (*Id.*). Officers also review and sign a multi-page acknowledgment form regarding paid meal breaks, uniform receipt, Handbook receipt, and Employment Standards, among other things. (*Id.*, ¶5 & Ex. D). Additional policies and procedures may appear in post orders at the client worksite(s) at which the security officer is stationed. However, these "post orders" vary according to site and even by client. (*Id.*, ¶5, Ex. B at 43, Ex C at 41).

The Handbook repeatedly states that it is company policy to comply with all applicable wage and hour laws. (*Id.*, ¶6 & Ex. A at 63, Ex. B at 62-65, Ex. C at 61-62). It provides employees with a hotline to report any wage and hour violations. (*Id.*, Ex. A at 20, Ex. B at 20, Ex. C at 20-21). In the event of a pay discrepancy, employees are provided with a Pay Discrepancy Form in order to ensure correct payment of wages. (*Id.*, ¶8 & Ex. D).

The Handbook does not require security officers to report to work early: "You are to be at your post and ready to begin work at your scheduled start time." (*Id.*, Ex. A at 35-36, Ex. B at 36, Ex. C at 33-34). It further directs security officers to record their actual work time:

> You are required to complete a daily timesheet. You must record the actual time you begin work and the actual time you end work. All timesheets must be completed in ink. If you voluntarily arrive early for work, but do not actually begin to work, you must record the time actual work begins versus your arrival time.

(*Id.*, Ex. A at 64, Ex. B at 65, Ex. C at 62). The Handbook instructs officers that "[f]illing out another employee's time record or falsifying any time record is prohibited" and "[e]ach

employee is solely responsible for the accuracy of his/her timesheet, and must advise management of any discrepancies even after the timesheet is submitted." (*Id.*, Ex. B at 65, Ex. C at 62). While Plaintiffs claim that the use of timesheets somehow prevents officers from accurately recording their time (Pl. Mem. at 5), as explained by one officer, "[i]f someone were 7 minutes late to relieve me, I would sign out at 4:07. I record my time on time sheets and have no problem recording it accurately." (Dunston Decl., ¶5).

With respect to uniform care, the Handbook requires only that: "You will be provided with the appropriate uniform, but it is your responsibility to make sure that the uniform is kept clean and neat." (Lanius Decl., Ex. A, at 41; Ex. B at 40; Ex. C at 38). Similarly, officers sign an Employment Standards Acknowledgment when hired that states: "Acceptable personal appearance, according to the standards of the job site and Handbook, is a requirement of employment. I agree to comply with these standards and to report to work in a neat, clean, acceptable uniform." (*Id.*, Ex. D, at 10). Neither can Plaintiffs' claims be based on any version of SUSA's Uniform Agreement. There, guards agree only to maintain their uniforms in "a clean and presentable fashion." (*Id.*, Ex. D, at 9).

No policy or Agreement requires officers to iron, dry clean, or professionally launder their uniforms. Indeed, following the May 2008 litigation in Illinois, SUSA specifically addressed the fact that employees should not spend uncompensated time caring for uniforms. SUSA's revised Uniform Agreement makes it absolutely clear that either the uniforms are wash and wear or if a uniform requires dry cleaning, SUSA will pay for it:

> I acknowledge receipt of all uniform items listed below. I agree that upon my employment separation from Securitas, I will return all Company property, including my uniform. I agree to maintain them in a clean and presentable fashion. I understand that I am not required to pay for repairs to damaged uniforms. Securitas agrees to pay for such costs of repairs. In addition, I understand that I am

> not required to pay for dry-cleaning costs to maintain my uniforms.
> Either my uniforms will be "wash-and-wear" and I will wash them
> or if they require dry-cleaning, Securitas, not I, will pay those
> costs.

(Lanius Decl., ¶9 & Ex. D, at 9).  Plaintiff Kimberly Ord signed this very Agreement in January

2009.  (Michael Decl., ¶¶4, 8 & Ex. A).

Throughout the statute of limitations period, SUSA has trained its supervisors to comply

with these policies.  SUSA's supervisor training materials explain on the first page in bold print:

"**All hours worked must be compensated**."  (Wade Decl., ¶2 & Ex. A, at 3).  The training

materials provide examples of compensable work, including:   training, responding to calls,

traveling to other sites to pick up other employees, picking up work-related supplies, and running

work-related errands.  (*Id.*).  During July 2008, SUSA's Pennsylvania managers participated in a

75-minute webinar on wage and hour issues.   (Wade Decl., ¶3).   The session covered the

definition of compensable work and covered avoiding off-the-clock pre-shift work, including

specific examples.  (*Id.,* Ex. B at 7).  The key points summarized for the managers at the end

were to:  "educate their employees about the rules, make sure their employees are recording all

working time, pay employees for meetings, training and interrupted meal periods, and do not

make deductions from pay for uniforms or equipment."  (*Id.*, at 18).  The training emphasized

that "SUSA is committed to paying all employees correctly for all hours worked, as required by

federal and state law," and "Supervisors who fail to follow the law or company policy will be

disciplined."  (*Id.*).  In connection with the July 2008 training, the Mid-Atlantic Region rolled

out a training acknowledgment to ensure that no training was being done off-the-clock.  (Wade

Decl., ¶5 & Ex. D).

The Mid-Atlantic Region management team has a strong culture of compliance.  (Lanius

Decl., ¶10).  It trains employees and conducts region, area and branch meetings throughout the

year at which it stresses the importance of paying employees for all time worked, and regularly visits branches in Pennsylvania to audit personnel records, payroll records and timesheets for wage and hour compliance. (*Id.*). Employees can and do fill out Pay Discrepancy Forms so that any paycheck errors can be corrected. (Corado Decl., ¶7). SUSA also has an anonymous hotline so that employees can voice concerns to management and report any workplace issues, including wage and hour issues. (Lanius Decl., ¶7).

Most recently, SUSA has implemented an employee arbitration policy. (Lanius Decl., ¶13, Ex. F). SUSA specifically disclosed the existence of this lawsuit in the arbitration agreement so that employees in Pennsylvania can make an informed decision regarding whether to opt out of it. (*Id.*, Ex. F at 3). In contrast to the experience of collective action members in Illinois, this policy will provide employees with a quick, informal and neutral means to contest any claim for lost wages. *AT&T Mobility LLC v. Concepcion*, __ U.S. __, 131 S.Ct. 1740, 1749 (Apr. 11, 2011).

**B.     SUSA's Operations Vary Widely Throughout The State.**

SUSA, a "cut to fit" operation, provides security officer services to a wide variety of clients in many different settings – corporate office buildings, manufacturing plants, distribution centers, warehouses, shopping centers, government buildings, schools, nursing homes, college dorms, construction sites, special events, movie premieres, and many others. (Lanius Decl., ¶2). SUSA has ten administrative offices in Pennsylvania organized into three areas:  Philadelphia (Philadelphia and Conshohocken), Mid-State (Harrisburg, Lancaster, Scranton, Allentown, and Munsey), and Pittsburgh (Pittsburgh, Altoona and Erie). (*Id.*, ¶3).

**C.     The Plaintiffs' Claims Differ And Rely On Individualized Facts.**

Even the three named plaintiffs have diverse claims. Frankie Williams worked as a security officer for SUSA out of the Conshohocken office from March 2007 to January 2010.

(Williams Decl., ¶2).  He was stationed at a Motorola corporate campus in Horsham, Pennsylvania during his entire employment.  (*Id.;* Yeats Decl., ¶¶2-4).  Williams was issued the soft-look uniform only, but was not required to wear *any* uniform for most of the posts that he manned at Motorola (some of which had no shift change, and so no pass down instructions). (Yeats Decl., ¶3-5).  He does not allege any unpaid training.  (Williams Decl.).

Plaintiff Matthew Devine worked as a security officer out of the Harrisburg office from June 2008 to April 2009.  (Devine Decl., ¶¶2-3).  He was stationed at eight worksites in the Altoona, Pennsylvania area (a number of which had no shift change and no pass down instructions) and was issued the military-style uniform only.  (*Id.*, ¶3; Gartner Decl., ¶6).  Devine does not claim that he ironed his uniform nor claim any unpaid training.  (Devine Decl.).

Plaintiff Kimberly Ord worked as a security officer out of the Altoona office from January 2009 to May 2010.  (Ord Decl., ¶¶2-3).  Ord was stationed at three worksites in the Altoona area during her employment (one of which had no shift change and no pass down instructions).  (*Id.*; Hampton Decl., ¶5).  Ord was issued a military-style uniform only and signed an acknowledgment at the time of hire that the uniform was wash and wear and she would submit dry cleaning expenses for reimbursement.  (Michael Decl., ¶3 & Exs. A, ).

### D.    There Is No Common Practice Regarding Uniform Maintenance In Pennsylvania.

As a result of this diversity, guards work under a cornucopia of conditions that are material to this case.  SUSA's uniform policies are simply not "uniform."  The garments themselves differ and the actual level of care depends on the location, supervisor, client, and on the fastidiousness of a particular employee.  Some SUSA locations have informal uniforms such as polo shirts.  (Thomas Decl., ¶ 13).  Polo shirts certainly require no special care such as ironing or dry cleaning.  (*Id.*, ¶14).  Other locations *require no uniforms at all*, including officers

stationed at a number of the posts at Motorola (where Plaintiff Frankie Williams worked and wore business casual clothes for much of his employment). (Hill Decl., ¶11; Yeats Decl.,¶5).

When uniforms are required, conditions under which they are worn and cared for vary widely.  For example, a common uniform worn in Pennsylvania is the military (or hard-look) uniform. (Hansen Decl., ¶5; Dixon Decl., ¶3; Yeats, ¶12).  This uniform has generally consisted of a gray shirt, gray pants, a bomber jacket, tie, belt, and badge.  (Hansen Decl., ¶6).  The shirts, pants and bomber jacket are made out of wash and wear material.  (Hansen Decl., ¶6).  Security officers can get multiple wearings out of their uniforms before washing them.  (Corado Decl., ¶10, Dunston Decl., ¶11; Ford Decl., ¶8; Decker, ¶13).

Filed herewith is testimony from a broad selection of guards.  It shows clearly that care of "hard look" uniforms is handled a variety of ways.  For example, many guards simply do not iron their uniforms at all.

- Joseph Vilcheck who works out of the Philadelphia office states:  "I wash the pants and shirt with my other clothes, and from time to time, hand-wash my necktie if I spill something on it.  The clothes are wash and wear and do not require ironing.  Nobody has told me to iron my uniform.  I do not shine my shoes, I usually wear black sneakers."  (Vilcheck Decl., ¶¶9-10).

- Anthony Ficca who works out of the Conshohocken office states:  "I throw all of the uniform pieces in the washing machine with my own clothes, separating whites and colors.  I do not iron any pieces of the uniform.  I hang them up to dry and they are fine.  I have never been told to iron my uniform, nor have I seen it in writing anywhere.  I understand that I am supposed to look clean and neat, which is what the employee handbook says."  (Ficca Decl., ¶¶ 12-14).

- Pernella Hill who works out of the Harrisburg office states:  "I wash the uniforms at home and put them in the dryer on permanent press, with or without other clothes.  There is no reason to iron.  I have never been told to iron the shirt or the pants.  I shine my shoes, although I have not been requested to do so."  (Hill Decl., ¶¶8-9).

- Debra Heeter, Scheduling Manager for the Harrisburg office, who has filled in to cover security officer shifts, states: "it is simple to maintain.  I wash the shirt and pants on a delicate cycle and dry them on low, with or without other clothes.  I hang them up and the seams stay in place.  I do not iron either the shirt or the pants and they look just fine and comply with the company's appearance standard, which is to look clean and neat."

(Heeter Decl., ¶10).

- Thomas Decker who works out of the Altoona office states: "My wife washes the shirt, pants and tie with our other clothes. Neither of us irons the shirt, pants or tie. My wife just uses fabric softener and hangs it up and it comes out okay. I have never been told or read that I needed to iron my uniforms at any site at which I have worked. I am unaware of others who are ironing their uniforms. In the military, we had to starch our uniforms and I have never seen that at the company. I polish my shoes once a month with liquid polish. It takes about five minutes." (Decker Decl., ¶14).

- Aaron Thomas who works out of the Pittsburgh office states: "I washed the shirts and pants on the regular cycle. I hung the shirts up to dry and did not iron them. I put the pants in the dryer and did not iron them. I washed and hung the tie to dry and did not iron it. I wore black shoes, and wiped them off as necessary." (Thomas Decl., ¶10).

Officers who iron their "hard look" uniforms (or whose wives do it) often do so for a

personal reasons, *not* because they have been directed by a company policy to do so:

- Clarence Nicholson who works out of the Conshohocken office states: "My wife washes my uniforms with our other clothes. She does not send anything out to be dry cleaned or laundered professionally. She irons my uniforms, which takes about 5 minutes. She irons every piece of clothing I wear, including my undershirts. I have never been directed to iron any part of my uniform. The handbook requires officers to look clean and neat. My wife makes me shine my shoes. No one at the company has ever told me to shine my shoes." (Nicholson Decl., ¶¶8-10).

- Timothy Patterson who works out of the Philadelphia office states: "The company requires us to look clean and neat. That is what it says in the handbook. We are not required to iron our uniform. I usually wear the military look uniform, which is a button-down wash and wear shirt and pants. I have enough shirts and pants to get me through the workweek. I wash the shirts and pants with my other clothes and iron them because I think they look better ironed. Based on my experience over the years working at many sites in the Philadelphia area, some guards do not iron either the shirt or the pants." (Patterson Decl., ¶¶11-13).

- Edwin Corado who works out of the Allentown office states: "I wash my shirts and pants with my own clothes in the washing machine. I get two wears out of the shirts, three to four wears out of the pants and I have not yet cleaned the tie. I iron my shirt once every two weeks along with my other dress clothes. I have never been told orally or in writing to iron my uniform." (Corado Decl., ¶¶10-11).

- Mark Ford who works out of the Pittsburgh office states: "I wash the uniform with my other clothes. If I do not leave them in the dryer, there is no need to iron them. If they have been left in the dryer for along time, I press them off for a

minute or two.  I have worked with a few people who iron their uniforms.  Ironing is not required by the handbook and nobody has told me that I have to iron my uniform.  I do not shine my shoes.  I wipe them off.  I occasionally buff my boots if I wear them."  (Ford Decl., ¶¶9-11).

Plaintiffs offer *no* evidence that guards in general, *or even they in particular*, were *required* to expend special care, such as ironing, to care for their uniform.  Indeed, as few as 20-25 of the 135 officers working out of the Altoona office iron their uniforms, and other areas of the state estimate similar numbers.  (Hampton Decl., ¶6; Hansen Decl., ¶6).

Other SUSA worksites require security officers to wear the lobby or soft-look uniform, which generally consists of a blazer, white shirt, pants, and tie.  (Hansen Decl., ¶7).  Officers take the same approach with their shirts as with their military-style uniform shirts (some iron, some do not iron).  Care of a "soft look" jacket also depends on the location, and the officer.

- Anthony Ficca who works out of the Conshohocken office states:  "I have not washed the blazer, I just brush it off if it gets dirty."  (Ficca Decl., ¶15).

- Michael Dunston who works out of the Philadelphia office states:  "I wash the shirt and slacks in the washer.  I am not required to iron the shirt and slacks, but usually do iron them with my other clothes.  I do not send anything to be laundered, but every three months or so, I have the jacket dry cleaned, which costs about $10.00.  I have three shirts, 2 pair of slacks, 4 ties and 2 blazers.  I get two wears out of the shirts, two to three out of the slacks, three months out of the blazer and can wear the tie until I spill something on it.  I have enough uniform pieces to last for the workweek.  I wear black shoes to work.  I do not shine them."  (Dunston Decl., ¶¶8-13).

- Margaret Ciewsky who works out of the Scranton office states:  "I usually get a new uniform every six months.  If I need new clothes, I just ask.  I wash the shirts and pants with my own clothes, and iron them along with ironing my everyday clothes.  It takes about 10 minutes.  I get the blazer dry cleaned every two to three months and it costs $8 or $9.  I have never sought reimbursement.  I have never been directed to iron my uniform.  The employee handbook says "look presentable."  I think that the post orders for my post may also refer to looking presentable."  (Ciewsky Decl., ¶¶10-12).

- Thomas Mihok who works out of the Pittsburgh office and is stationed at a high end watch retailer states:  "I wash the shirt and pants with my other clothes.  Sometimes my wife irons them, but they are pretty low maintenance.  I have my blazer dry cleaned 2-3 times every other month.  I had my tie dry cleaned for the

first time this month.  My wife drops off and picks up my dry cleaning.  I do not shine my shoes.  I just wipe them off."  (Thomas Mihok Decl., ¶¶7-8).

In addition, some officers leave their jackets at their worksite and do not have them cleaned at all. (Filkosky Decl., ¶2).

### E.   Plaintiffs Have Shown No Common Practice In Pennsylvania Requiring Employees To Violate Company Policy By Working Before Their Shift Begins.

Plaintiffs' three "bare bones" declarations claim with no elaboration that they were required to work before their shifts began to "perform[] work including reviewing post orders and receive[] pass down instructions." (Pl. Mem. at 4).  If so, they (a) did so against company policy; and (b) did so contrary to the practice of other employees.  Moreover, plaintiffs never identify the circumstances under which this "time" is worked, whether it is *de minimus* or whether the work could or should have been done during their shift.  They allege only that they did the work, did it before the shift, and that it was "necessary and integral" to their job duties. (Pl. Mem. at 4).

Whatever the merits of these allegations, they do not suggest any statewide practice. Many SUSA work posts are either one-shift posts or have a time gap between shifts, so that there is no shift change at all. (Yeats Decl., ¶6; Gartner Decl., ¶¶8, 14, 15; Hampton Decl., ¶4; Decker Decl., ¶¶5, 6, 8; Thomas Decl., ¶7; Ford Decl., ¶6; Vilcheck Decl., ¶6; Mihok Decl., ¶10; Hill Decl., ¶¶5, 12; Patterson Decl., ¶6 Ciewsky Decl., ¶¶3-4).  Where shift changes exist, guards can and do communicate using daily activity reports, security officer activity reports or logs kept at the sites so that no "overlapping" work is needed.  (Nicholson Decl.¶17; Patterson, ¶8; Dunston, ¶4).   Other sites have on-site supervisors whose schedules overlap with the security guards on post so that the supervisors can provide any necessary pass down information to the relieving officer once he or she starts work.  (Ficca Decl., ¶9).  When guards communicate during shift

changes, they are often scheduled at low activity times to enable the officers to speak about anything pertinent quickly. (Yeats Decl., ¶7). Where clients prefer to have more than *de minimis* interaction between the relieving and relieved officers, SUSA can and does pay for overlapping shifts. (Gartner Decl., ¶¶7, 10; Thomas Decl., ¶12). In short, there is no broad or identifiable practice – or even any need -- that would require employees to violate policy by working off the clock.

F. **Plaintiffs Have Shown No SUSA Policy That Generally Requires Unpaid Training.**

SUSA provides many training opportunities to its security officers. (Lanius Decl., Ex. A at 25-26; Ex. B at 26, Ex. C at 24-25). For example, the Advanced Certification Training ("ACT") for security officers is available at worksites so that security officers can do the training while on duty. (Ficca Decl., ¶10; Nicholson Decl., ¶4; Patterson Decl., ¶4; Corado Decl., ¶8; Vilcheck, ¶4; Thomas Decl., ¶6). All security officers do not complete training because it is not required by many of the company's clients. (Ciewsky Decl., ¶7; Hill Decl., ¶4; Dunston Decl., ¶14; Mihok Decl., ¶4; Ford Decl., ¶4; Decker Decl., ¶20).

The July 2008 wage and hour webinar attended by managers in Pennsylvania (discussed above) specifically addressed the importance of paying security officers for their time spent in training. (Wade Decl., ¶3 & Ex. B). Following that webinar, an acknowledgment form was rolled out for security officers to sign acknowledging that all training must be approved and done during working hours. (Wade Decl., ¶5 & Ex. D). Several months later, SUSA distributed a training pay policy designed and intended to ensure that the company pays for all compensable training. (Lanius Decl., ¶11 & Ex. E). SUSA also added an acknowledgment to its e-learning portal that all training must be done on the clock and that employees must record and submit any time spent in training. (Wade, ¶4 & Ex. C). In sum, SUSA's policy requires employees to be

12

paid for training time.[3]

## III.   ARGUMENT

### A.   Legal Standard:  To Be "Similarly Situated," Plaintiffs Must Submit Facts Showing That Their Claims Can Be Resolved By Common Proof.

A plaintiff may bring a collective action alleging violation of the FLSA on behalf of those who are "similarly situated" and who consent to join the action.  29 U.S.C. § 216(b). "Section 216(b)'s affirmative permission for employees to proceed on behalf of those 'similarly situated' grants a district court the requisite procedure authority to manage the process of joining multiple parties" in an orderly and sensible manner.  *Hoffman-La Roche Inc. v. Sperling*, 493 U.S. 165, 170 (1989).  District courts have "discretion, in appropriate cases, to implement 29 U.S.C. § 216(b) . . . by facilitating notice to potential plaintiffs."  *Id.* at 169.  Unlike class actions under Rule 23, Section 216(b) requires class members to affirmatively opt in to FLSA collective actions.  29 U.S.C. §216(b).

Courts in the Third Circuit follow a two-step procedure in determining whether a plaintiff's claims may proceed as a collective action.  *Smith v. Sovereign Bancorp., Inc.*, 2003 U.S. Dist. LEXIS 21010, *4 (E.D. Pa. Nov. 13, 2003) (J. Schiller).  "The first step, generally conducted early in the litigation process, is a preliminary inquiry into whether the plaintiffs' proposed class is constituted of similarly-situated employees."  *Id.*  The second step is conducted at the close of discovery and "consists of a specific factual analysis of each employee's claim to ensure that each proposed plaintiff is an appropriate party."  *Bramble v. Wal-Mart Stores, Inc.*,

---

[3]  Historically, Securitas has not considered the new hire process to be compensable because the time spent in the process is in the nature of application, screening and evaluation.  The fingerprinting and background check portions of the process are state licensing requirements in Pennsylvania, and for the benefit of the applicants.  Securitas does not derive a benefit from the applicants while they are in session, and they cannot be placed at a worksite until they successfully complete the session.  In any event, in an abundance of caution, in January 2010, the company began paying for this process.  (Lanius Decl., ¶12).

2011 U.S. Dist. LEXIS 39457 (E.D. Pa. Apr. 12, 2011) (J. O'Neill).

Plaintiffs concede that they must make a "modest factual showing" that they are similarly situated to putative collective action members. (Pl. Mem. at 9). This means that they must "make a basic factual showing that the proposed recipients of opt-in notices are similarly situated to the named plaintiffs"). *Smith, supra,* at *10; *accord Bramble,* at *16 (requiring a "sufficient factual basis on which a reasonable inference could be made that potential plaintiffs are similarly situated"). Speculation is not sufficient and "the factual showing, even if modest, must still be based on some substance," as well as admissible evidence. *Id.* at *17; *Dreyer v. Altchem Environmental Servs., Inc.*, 2007 US. Dist. LEXIS 71048, *7 (D. N.J. 2007). Where plaintiffs fail to satisfy their burden, conditional certification should be denied in order to "avoid the 'stirring up' of litigation through unwarranted solicitation." *Smith, supra,* at *18.

Plaintiffs argue at length that due to the fact that no discovery has been had in this case, their burden is light and the standard, lenient. However, Plaintiffs actually purport to rely in their Motion on discovery from the Illinois case (Pl. Mem. at 9), and could have, but chose not to, conduct discovery (or even, it seems, to investigate the relevant facts with their clients). Further, the cases Plaintiffs cites require actual evidence and require the evidence to show a potentially unlawful company policy or show that plaintiffs are similarly situated to putative collective action members.[4]

---

[4] *E.g. Harris v. Healthcare Servs. Group, Inc.,* 2007 U.S. Dist. LEXIS 55221, *2 (E.D. Pa. July 31, 2007) (noting that the court dismissed plaintiffs' first motion "because plaintiffs had made no factual showing in support of their motion for court-supervised notice"); *Parker v. NutriSystem, Inc.*, 2008 U.S. Dist. LEXIS 74896, *5 (E.D. Pa. Sept. 26, 2008) (burden met in claim for overtime under the FLSA where the plaintiff and the opt ins submitted declarations detailing their compensation plan and submitted admissible evidence showing a potentially unlawful compensation plan); *Smith, supra* (denying conditional certification "because Plaintiffs fail to provide any factual or evidentiary basis for the inclusion of all Defendant's hourly employees in the putative class").

As explained by Judge McLaughlin in *Bamgbose v. Delta-T Group, Inc.*, 684 F. Supp.2d 660, 667 (E.D. Pa. 2010), whether a plaintiff is similarly situated to those whom he or she seeks to represent turns on the proof required to demonstrate liability on the claims alleged. In that case, a healthcare worker sued his temporary staffing agency, Delta-T, claiming that it had misclassified him as an independent contractor and had failed to pay him overtime under the FLSA. Bamgbose sought to have the case conditionally certified on behalf of other health care workers who worked more than forty hours per week within the applicable time period. *Id.* at 667. He argued that the putative collective action members were similarly situated because Delta-T had a uniform policy of classifying all healthcare workers as independent contractors, and had common payment procedures, intranet and telephone systems. *Id.* at 668-668. The Court disagreed, explaining that whether the class was similarly situated depends on whether the proof required to resolve the merits can be applied to the class as a whole:

> The Court must analyze whether the healthcare workers are similarly situated with respect to the analysis it would engage in to determine whether the workers are employees or independent contractors. The Court cannot only look to Delta-T's uniform classification of the workers or its common payment procedures, intranet, and telephone systems. Instead, it must determine whether the proof to demonstrate that the workers are "employees" or "independent contractors" can be applied to the class as a whole.

*Id.* at 668-669 (citing *Hoffman-LaRoche, Inc.*, 493 U.S. at 170 (noting that collective actions allow plaintiffs the advantage of lower individual costs by collectively bringing one proceeding of common issues of law and fact)).

Judge McLaughlin noted that a seven-factor test governed whether an employment relationship (versus an independent contractor relationship) exists, and that six of the seven factors varied depending on the worker and the client (which could range from major healthcare institutions to family homes), and only factor could be evaluated on behalf of all the collective

action members. *Id.* at 670-71. The Court thus denied the motion for conditional certification,

holding that it could not be maintained "when the class appears similarly situated with respect to

only one factor." *Id.* at 671. The Court further rejected the argument that the problem could be

remedied by sub-classes. *Id.* Accord *Bramble v. Wal-Mart Stores, Inc.*, 17 WH Cases.2d 856

(E.D. Pa. Apr. 12, 2011) (J. O'Neill) ("[t]he right to proceed collectively may be foreclosed

where "an action relates to specific circumstances personal to the plaintiff rather than any

generally applicable policy or practice") (quotation omitted).

### B.   Plaintiffs Have Failed To Meet Their Burden That They Are Similarly Situated With Respect To Any Of The Claims Alleged Here.

#### 1.   Plaintiffs Have Failed To Make A Modest Factual Showing That The Uniform Maintenance Claim Is Susceptible To Common Proof.

Plaintiffs seek to certify a collective action with respect to their claim that they were

required to spend time maintaining their uniforms without pay in violation of the FLSA. "Where

uniforms are (a) made of 'wash and wear' materials, (b) may be routinely washed and dried with

other personal garments, and (c) do not require ironing or any other special treatment such as dry

cleaning, daily washing, or commercial laundering, [the Wage and Hour Division of the

Department of Labor] will not require that employees be reimbursed for uniform maintenance

costs." DOL FIELD OPERATIONS HANDBOOK, §30c12(b)(2) (Dec. 9, 1988). If these criteria are

not met, then such maintenance costs "cannot be borne by the employee if in doing so he/she

receives less than the minimum wage or the costs would cut into any overtime wages." *Security

Guard/Maintenance Service Industry Under the Fair Labor Standards Act (FLSA),* (DOL Wage

and Hour Div. Fact Sheet #4 July 2008).

In order meet the "similarly situated" standard with respect to this claim, Plaintiffs have

the burden of demonstrating that it can be resolved based on proof that is common to the putative

collective action members. They cannot do so.

16

### a.   Military-Look Uniform

Time spent on uniform care is compensable only if security officers were required to iron the uniform or give it any special treatment such as dry cleaning, daily washing, or commercial laundering (element c). Two immutable facts bar this claim from being established based on proof common to the class: (a) company policy (which requires only that officers look "clean and neat" and "presentable") and the uniform agreements stating that the uniforms do not require special care; and (b) as shown in the many declarations filed herewith, guards are not *required* to give the garments such special care. Clearly many guards felt no pressure or need to give their uniforms such care. *See* Section II(C), *supra*. Thus, at a minimum, the need to iron a uniform will depend on the work location, supervisor, and the particular guard.

Thus, in order to prove their claim, Plaintiffs must argue that there was a requirement beyond the policy stated in the Handbook and Uniform Agreement *requiring* special treatment. Proving this element alone would require individualized proof. Even if it did not, the employee would still have to prove additional facts to prevail -- (1) that he or she spent time ironing, (2) the amount of time, (3) the workweek during which the time was spent, (4) whether that extra time during that workweek caused his or her regular rate to dip below the minimum wage, and (5) whether that extra time caused him or her to work more than 40 hours, thus resulting in an underpayment of overtime.

Further, Plaintiffs have failed to show that they are similarly situated to putative class members who could potentially clear the "ironing" hurdle to even get to items (1) – (5). First, Plaintiff Matthew Devine does not even claim that he ironed his military-style uniform (Devine Decl., ¶¶4-5) (which tends to show that ironing was not required), and Plaintiff Frankie Williams was not issued this type of uniform. This leaves only Kimberly Ord. One declaration from a plaintiff does not meet the similarly situated standard as a matter of law, particularly, where, as

here, Ord does not even allege that other employees were required to iron their uniforms.  *E.g.*

*Bramble, supra* at *22 (denying certification because plaintiffs "do not provide even modest

evidence beyond their own speculation that their experience "can be more broadly applied");

*Cartner v. Hewitt Assoc.*, LLC, 2009 U.S. Dist. LEXIS 97595, *7 (M.D. Fla. Oct. 7, 2009)

(denying conditional certification based on plaintiff's conclusory assertions and no other

declarations).

Moreover, Ord does not even claim that she was required to iron – she states only that she

was "required to clean and maintain [her] uniform pursuant to the Securitas dress code and

uniform policies." (Ord Decl., ¶7).  As discussed above, the appearance standards are "clean and

neat" and "presentable,[5] and Ord signed a Uniform Agreement when she was issued her military-

look uniform acknowledging that it was wash and wear:

> I agree to maintain them in a clean and presentable fashion.  I
> understand that I am not required to pay for repairs to damaged
> uniforms.  Securitas agrees to pay for such costs of repairs.  In
> addition, I understand that I am not required to pay for dry-
> cleaning costs to maintain my uniforms.  Either my uniforms will
> be "wash and wear" and I will awash them or if they require dry-
> cleaning, Securitas, not I , will pay these costs.

(Michael Decl., Ex A).  "Wash and wear" means "a fabric or garment that needs little or no

ironing after washing."  Merriam Webster, www.merriam-webster.com.  Having agreed that her

uniform does not require ironing, she is not similarly situated to anyone who could possibly

make the argument that ironing was required.

Plaintiffs then submit excerpts from training materials that were evidently produced in

another case to argue that SUSA required ironing.  (Pl. Mot. at Exs D, E).  Plaintiffs'

declarations do not even indicate whether they themselves ironed their uniform as the result of

---

[5] Ord had trouble meeting this standard, as she was counseled for wearing a uniform that was
"dingy and dirty and looked like it had not been washed in four or five days" (with no mention of
ironing) and for having a messy, inappropriate hairstyle.  (Karen Michael Decl., ¶7 & Ex. E).

this particular training, or that they even received the training at all and the documents are not even authenticated. In addition, while one document has a stray reference to "neatly pressed" in a bullet point list, it elsewhere clearly states under the heading "Appearance – Uniform Articles" and the sub-heading "Shirts and Trousers" that "uniforms should be clean and properly maintained at all times." (Pl. Mot, Ex. D, Docket 18-4, at 3-5). The other document states: "Your uniform should fit well and be kept clean, unwrinkled and in good condition." (Pl. Mot., Ex. E, Docket 18-5, at 8). However, a wash and wear uniform does not have be pressed to look unwrinkled, as evidenced by the large number of employees who do not iron their uniforms. For those who do iron, their reasons are varied and do not appear to be tied to any company policy. E.g. *Saleen v. Waste Management, Inc.*, 2009 U.S. Dist. LEXIS 49891 (D. Minn. June 15, 2009) (denying conditional certification where the reasons for why the trash haulers did not take advantage of the procedure to reverse the auto deduct of their meal period were too varied). Thus, any uniform maintenance claim based on the military style uniform cannot be resolved based on common proof.

**b.**     **Soft-Look Uniform.**

Of the three Plaintiffs, only Frankie Williams wore the soft-look uniform for a portion of his employment, and he did not wear *any* uniform for other portions of his employment. (Yeats Decl., ¶¶3-4). While Williams claims to have ironed some parts of his uniform and taken other parts to the dry cleaner, he does not specify the parts and fails to identify any specific company policy *requiring* ironing or dry cleaning:

> Upon being hired by Securitas, and while employed by Securitas, I was given a work uniform and required to clean and maintain my uniform pursuant to the Securitas dress code and uniform policies. I regularly washed and iron some parts of my uniform and took others to the cleaners. I was not paid for any of the time I spent performing uniform maintenance work.

19

(Williams Decl., ¶4).   One declaration that does not even allege that others had the same experience fails to meet Plaintiff's burden to prove that they are similarly situated with respect to other putative class members. *E.g. Bramble, supra* at *22 (denying certification because plaintiffs "do not provide even modest evidence beyond their own speculation that their experience "can be more broadly applied"); *Cartner,* supra, at *7.   Furthermore, as discussed above in Section III(B)(1)(a), even if Williams could prove that ironing or dry cleaning were required, there are still at least five other elements that must be proved to state a claim for violation of the FLSA, all of which require individualized proof.   Accordingly, no collective action should be certified with respect to alleged off-the-clock time spent maintaining the soft-look uniform.

### c.      Other Uniforms.

Because there is no allegation that Plaintiffs wore any of the other uniforms in use in Pennsylvania, or any evidence that they required ironing or other special maintenance, no collective action could be conditionally certified as to them.

### 2.      Plaintiffs Have Failed To Make A Modest Factual Showing That The Pre-Shift Work Claim Can Be Resolved Based On Common Proof.

Plaintiffs seek to certify a collective action with respect to their claim that they were not compensated for pre-shift work such as receiving pass down instructions, inspecting equipment, and talking to supervisors.   In order to meet their burden on this motion, Plaintiffs must show that whether they were suffered or permitted to work and the elements of SUSA's defenses are susceptible to common proof.   Under the FLSA, in order for time to be compensable, the employee must have been suffered or permitted to work.   29 U.S.C. § 203(g).   There are numerous statutory defenses to these claims.   First, the Portal to Portal Act provides that employers are not required to pay minimum wage or overtime for walking to the actual place of

performance of the principal activity and activities that are preliminary to such principal activities. 29 U.S.C. §254(a); 29 C.F.R. §§785.34; 785.50. Where, as here, a log book contains all required information and employees were not required to report early, alleged pre-shift activities have been held non-compensable. *Lindow v. U.S.*, 738 F.3d 1057, 1061-62 (9th Cir. 1984). Second, in recording working time under the Act, insubstantial or insignificant periods of time beyond the scheduled working hours, which cannot as a practical administrative matter be precisely recorded for payroll purposes, may be disregarded, as *de minimis*. *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680 (1946). Third, rounding to the nearest five, ten or fifteen minutes is permitted by law, so long as it does not always favor the employer. 29 C.F.R. § 785.48(b).

Plaintiffs have failed to make a modest factual showing that the merits of their pre-shift off-the-clock work claim can be resolved based on common proof. First, Plaintiffs' declarations do not even state a claim for violation of the FLSA, which prevents them from being similarly situated to anyone who could state a claim. Williams states that while employed with SUSA from March 2007 to January 2010, he worked at posts in four office buildings and in the communications center at the Motorola client site in Horsham, Pennsylvania. (Williams Decl., ¶2). While he claims that he began work before he shift start time, he does not specify whether he acted pursuant to a specific company policy, whether anyone directed him to do so or whether SUSA was even aware that he did so:

> While employed by Securitas, I regularly arrived at work early and performed job-related tasks like receiving pass down instructions, checking equipment and meeting with supervisors before my scheduled shift start-time. I was not paid for any of this pre-shift work.

(Williams Decl., ¶3). While he refers to meeting with supervisors before shift start time, he fails to name them or specify whether they were employed by the client or SUSA. (*Id.*). Williams

claims to have worked at numerous posts, but does not disclose which posts he was working when he allegedly performed pre-shift work without pay.  (*Id.*).  In fact, a number of the posts at this worksite *have no shift change*, so there would be no pass down instructions at all.  (Yeats Decl., ¶6).  Williams does not explain why he did not record the time that he claims to have worked pre-shift.  (Williams Decl.).  Nor does he point to anyone else who had the same alleged experience.  Indeed, it would be entirely consistent with Williams' Declaration that he arrived on post for his own convenience due to commuting issues and so that he would not be late and may have begun work without reporting it unbeknownst to the company, even though instructed by the company that he was not to start work before shift start time and was to record all time spent working on his timesheets.  This would not be a violation of the FLSA.

Plaintiff Kimberly Ord makes the same allegation as Williams, word for word (Ord Decl., ¶6).  Further, like Williams, one of the posts she regularly staffed *did not even have a shift change*.  (Hampton Decl., ¶5).  Plaintiff Matthew Devine makes a similar claim—it is so devoid of detail as even to enable response.  He does not even claim that he was told to arrive before his scheduled shift or work off the clock or that SUSA even had notice of such alleged activity:

> I worked before the start of my scheduled shift and was not compensated.  Among other things I received pass-down instructions and reviewed post orders before the start of my scheduled shift.

(Devine Decl., ¶6).  Like Williams, neither Ord nor Devine address identify any other security guards who were suffered or permitted to violate the Company's stated policy to pay for time worked.[6]  Conditional certification as to this claim should be denied for this reason alone.  *E.g., Cartner,* U.S. Dist. LEXIS 97595, *7 (M.D. Fla. Oct. 7, 2009).

Second, Plaintiffs appear to argue that the use of time sheets was somehow an unlawful

---

[6] Plaintiffs make sweeping statements about shift change procedures in their brief (Pl. Mem. at 3), but failed to submit any evidence to support them.

policy or practice that prevented them from accurately recording their time.  (Pl. Mem. at 5).

However, the use of time sheets is neither unlawful nor does it reduce the need for individual

inquiry.  29 C.F.R. § 785.48  ("Time clocks are not required"); *Brickey v. Dolgencorp. Inc.*, 272

F.R.D. 344 (W.D.N.Y. 2011) ("the Court declines to hold that facially lawful policies, which

encourage store management to make productive use of employees' time or to report for work

when scheduled, can form the equivalent of a "common policy or plan that violate[s] the law,'

merely because they indirectly might encourage the minimization of overtime.").   Further,

Plaintiffs claim in their brief that there was no clock at their worksites (Pl. Mem. at 5), but make

no reference whatsoever to this in their declarations.

Third, there is more than sufficient evidence before the Court for it to determine that

resolution of this array of varied claims turns on highly individualized issues at differing

worksites.  *See  e.g,, Cartner*, 2009 U.S. Dist. LEXIS 126969, *11-13 (M.D. Fla. Mar. 21, 2010)

(denying  conditional  certification  of  off-the-clock  claims  where  there  were  significant

differences in the manner in which each team started and ended their shifts, took breaks, and

handled client calls, and there were significant differences among the named plaintiffs in this

regard, and these and other individualized inquiries will need to be made on a plaintiff-by-

plaintiff basis).  Plaintiffs have failed to make a modest factual showing that their pre-shift work

off-the-claim claim can be resolved based on common proof and conditional certification as to

this claim should be denied.

> **3.     Plaintiffs Have Failed To Make A Modest Factual Showing That They
> Are Similarly Situated To Anyone With Respect To Training Time.**

Plaintiffs seek to certify a collective action with respect to their claim that they were

required to attend training for which they were not paid.  The DOL regulations provide that

training need not be counted as working time if:  (1) attendance is outside of regular working

hours, (2) it is voluntary, (3) the training is not directly related to the employee's job, and (4) the employee does on perform productive work during it.  29 C.F.R. § 785.27.  However, if the training corresponds to a program of instruction corresponding to courses offered by independent bona fide institutions of learning, voluntary attendance outside working hours is not working time, even if directly related to the job. 29 C.F.R. § 785.31.  Further, with respect to new hire orientation, where the recipient of training meets the six criteria for a trainee, there is no duty to pay for time spent in it.  DOL Field Ops. Handbook, §10b11.

Plaintiffs have failed to meet their burden that they are similarly situated to others whom they seek to represent for a number of reasons.  First, neither Plaintiffs Frankie Williams nor Matthew Devine even claim that they did any training or new hire orientation off the clock. (Williams Decl., Docket 18-6; Devine Decl., Docket 18-8).  This leaves only Plaintiff Kimberly Ord, who does not even claim that others had the same experience.  Collective certification cannot be granted based on evidence of only one person's experience. *E.g., Cartner*, U.S. Dist. LEXIS 97595, *7 (M.D. Fla. Oct. 7, 2009).

Second, Ord has failed to allege enough facts to even state a claim for violation of the FLSA, and thus has failed to make a modest factual showing that she is similarly situated to those who potentially could.  She alleges only that she "completed course work and forms for various work-related certifications and was not paid for this work."  (Ord Decl., Docket 18-7, ¶5).  Ord does not even identify the training or specify any facts relating to necessary elements of this claim -- whether SUSA was even aware that she did the training off duty instead of on her shift, if not, whether she recorded the time and how much, whether attendance was outside of regular working hours, whether the training was voluntary, whether she performed productive work during it, whether the course was similar to courses offered by independent educational

institution, and whether the time caused her pay to dip below the minimum wage or caused her to work more than 40 hours in the workweek at issue.  Plaintiffs allege "facts" with respect to training in their brief (Pl. Mem. at 2-3), but failed to submit any supporting evidence.

Third, the same holds true for Ord's allegations with respect to her new hire orientation. She refers to various forms that she filled out, read and videos that she viewed, but she fails to provide details that would even enable one to determine whether she has stated a violation of the FLSA. (Ord Decl., ¶4).  Nor does she refer to anyone else who experienced the same thing.

Finally, there is more than enough evidence before the Court for it to determine that resolution of this issue would require individualized proof of whether guards at remote worksites did their training while on duty, and if not, whether SUSA had notice.

## IV.   CONCLUSION

The Court should deny conditional certification because Plaintiffs have failed to sustain their burden of proving that their claims are similarly situated to those whom they seek to represent.  Plaintiffs have failed to identify any unlawful company policy and the claims alleged are not susceptible to common proof.[7]

Dated:  June 24, 2011                    LITTLER MENDELSON, P.C.

_____
Martha J. Keon (Bar No. 207237)
Corinne Hays (Bar No. 308024)
LITTLER MENDELSON, P.C.
Three Parkway, Suite 1400
1601 Cherry Street
Philadelphia, PA 19102
267-402-3000 Telephone; 267-402-3131 Facsimile
mkeon@littler.com; chays@littler.com

---

[7] Were the Court to grant Plaintiffs' motion, it should not approve the proposed notice for a number of reasons, including that it fails to adequately identify the statute of limitations, is addressed to a broader group of current and former members than alleged in the First Amended Complaint.  Defendant requests the right to meet and confer on the content of any proposed notice.  Defendant objects to disclosing phone numbers or e-mail addresses on privacy grounds.

## CERTIFICATE OF SERVICE

I, Martha J. Keon, hereby certify that on this 24th day of June 2011, I electronically filed the foregoing document with the clerk of Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record identified below in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in another authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

> David J. Cohen
> Wayne A. Ely
> KOLMAN ELY, P.C.
> 414 Hulmeville Avenue
> Penndel, PA 19047
> 215-750-3134
> dcohen@kolmanlaw.net
>
> John A. Tostrud  (pro hac vice)
> CUNEO GILBERT & LADUCA LLP
> 1901 Avenue of the Stars, Suite 200
> Los Angeles, CA 90067
> 310-461-1620
> jtostrud@cuneolaw.com
>
> Ryan F. Stephan (*pro hac vice*)
> James B. Zouras (*pro hac vice*)
> STEPHAN ZOURAS, LLP
> 205 North Michigan Avenue, Suite 2560
> Chicago, IL  60601
> 312-233-1550
> rstephan@stephanzouras.com
> jzouras@stephanzouras.com

/s/ Martha J. Keon

MARTHA J. KEON

Dated: June 24, 2011