```
            IN THE UNITED STATES DISTRICT COURT
         FOR THE EASTERN DISTRICT OF PENNSYLVANIA

FRANKIE WILLIAMS, et al.        :       CIVIL ACTION
                                :
         v.                     :
                                :
SECURITAS SECURITY SERVICES     :
USA, INC.                       :       NO. 10-7181
```

MEMORANDUM

Bartle, J.                                          August 17, 2011

        Plaintiffs Frankie Williams, Kimberly Ord, and Matthew Devine on behalf of themselves and others similarly situated have filed this action against defendant Securitas Security Services USA, Inc. ("Securitas") under §§ 206 and 207 of the Fair Labor Standards Act ("FLSA"). Securitas is a company that supplies security guards to its clients. Plaintiffs contend that they and other security guards in Pennsylvania were denied wages, including overtime wages, in violation of the FLSA. Before the court is the motion of plaintiffs to certify conditionally a collective action under § 216 of the FLSA to include all Securitas employees in Pennsylvania.

                                  I.

        FLSA violations affecting multiple employees may be redressed in a collective action. 29 U.S.C. § 216(b); Hoffman-LaRouche v. Sperling, 493 U.S. 165, 169-71 (1989). Unlike traditional class actions, however, each allegedly wronged employee must elect to join the class of claimants. 29 U.S.C. § 216(b). Due to this unique "opt-in" requirement, FLSA

plaintiffs may be unable to identify other claimants without the benefit of notice to the putative class and discovery.  Sperling v. Hoffman-LaRouche, 118 F.R.D. 392, 406 (D.N.J. 1988), aff'd 862 F.2d 439 (3d Cir. 1988), aff'd 493 U.S. 165 (1989).  As a result, in cases such as this, courts follow a two-step procedure in determining whether to certify a collective action under § 216. Parker v. NutriSystem, Inc., No. 08-1508, 2008 WL 4399023, at *1 (E.D. Pa. Sept. 26, 2008).

At the first step, the court determines whether the plaintiff has made a preliminary showing that its claims are similar to the claims of the members of the putative class.  Id.; see Bramble v. Wal-Mart Stores, Inc., No. 09-4932, 2011 U.S. Dist. LEXIS 39457, at *13-*14 (E.D. Pa. Apr. 12, 2011).  The first step occurs early in litigation, typically before much discovery has occurred.  Bramble, 2011 U.S. Dist. LEXIS at *14; Bamgbose v. Delta-T Grp., Inc., 684 F. Supp. 2d 660, 667-68 (E.D. Pa 2010).  At the second step, typically after the close of class-related discovery, the court reconsiders class certification in light of the facts developed in discovery. Bamgbose, 684 F. Supp. 2d at 668.

In this first stage of the analysis, before notice and discovery, we require only that the plaintiffs make a "modest factual showing" that their claims are similar to other potential class members.  Smith v. Sovereign Bancorp, Inc., No. 03-2420, 2003 WL 22701017, at *2-*3 (E.D. Pa. Nov. 13, 2003); see Parker, 2008 WL 4399023 at *2.  In the context of FLSA collective

actions, "similarity" between class members' claims means that the class members share common "terms and conditions" of employment, which may be shown through the existence of a "common policy, plan, or practice." Bramble, 2011 U.S. Dist. LEXIS at *15. On the other hand, evidence that each class member's claim will hinge on his or her "specific circumstances" weighs against conditional certification. Id. We also consider whether the plaintiffs and class members would use the same evidence to prove their claims. Bamgbose, 684 F. Supp. 2d at 668-69.

In recognition of the early stage of the case, we require plaintiffs to make only a "modest factual showing" of the requisite similarity. Smith, 2003 WL 22701017 at *2-*3. This standard is "undemanding" and "extremely lenient," but it is "not non-existent." Bramble, 2011 U.S. Dist. LEXIS at *16; Parker, 2008 WL 4399023 at *2; Smith, 2003 WL 22701017 at *3. Thus, plaintiffs must come forward with some facts from which the court may infer similarities between the plaintiffs' claims and those of putative class members.

II.

Plaintiffs are three former Securitas employees who worked as security guards at varying times between 2007 and 2010. In their first amended complaint, plaintiffs allege that Securitas violated the FLSA by "knowingly suffering or permitting Plaintiffs and the Class members to perform" four kinds of work without compensation, namely "job training work, pre-shift work, post-shift work and uniform maintenance work." Under the FLSA,

employers are required to pay at least a specified minimum hourly wage to non-exempt employees for work they perform.  29 U.S.C. §§ 206(a), 213; De Asencio v. Tyson Foods, Inc., 342 F.3d 301, 306 (3d Cir. 2003).  In their motion, plaintiffs seek to certify a collective action of claimants who can state claims on some or all of the grounds described in the first amended complaint.

As noted above, plaintiffs contend that Pennsylvania Securitas employees were required to perform job training work for which they were not compensated.  The facts before the court reveal at least two kinds of training programs at Securitas, an initial orientation program completed before employment and other training programs completed during employment.  In a declaration submitted with plaintiffs' motion, plaintiff Ord stated that she participated in an initial orientation at which she completed tax forms, was fingerprinted, read and signed employment forms, received a uniform, received instructions on completing time sheets, and viewed work-related videos.  The other two plaintiffs, Williams and Devine, do not mention the initial orientation program in their declarations even though it appears all Securitas employees must attend an orientation.  Securitas acknowledges that until January 2010, it did not compensate its Pennsylvania employees for time spent at its orientation program. It maintains that the initial orientation primarily confers a benefit on the employee because it allows the employee to complete certain Pennsylvania licensing requirements.

At this early stage of the litigation, it appears the orientation consists of, among other things, training on Securitas' internal company procedures and performance requirements.  Accordingly, we may infer employees participate in the program for Securitas' benefit.  See Tenn. Coal, Iron & R.R. Co. v. Muscoda Local 123, 321 U.S. 590, 597-98 & n.11 (1944).  On the basis of Ord's declaration and Securitas' representations, the court is satisfied that Ord's FLSA claim pertaining to the initial orientation program arose from an employment practice common to all Securitas employees in Pennsylvania.  See Bramble, 2011 U.S. Dist. LEXIS at *15; Parker, 2008 WL 4399023 at *2.  Accordingly, the court will grant plaintiffs' motion to certify conditionally a collective action of Securitas employees who did not receive compensation for attending Securitas' initial orientation.

Ord's declaration also states that she "completed course work and forms for various work-related certifications and was not paid for this work."  Although her declaration does not say so explicitly, Ord implies that Securitas sponsored the training to which she refers.[1]  Of the three plaintiffs, only Ord attests to having participated in training programs during her employment.

---

1. Ord's declaration does not specify who sponsored these programs.  An equally-plausible reading of her declaration is that Ord "completed course work and forms for various work-related certification" outside of work hours at a local community college or vocational training center.

In opposition to the motion before the court, Securitas submitted the declarations of other security guards and administrative staff from across the Commonwealth.  Among the security guards who submitted such declarations, some reported completing Securitas training programs and others stated they elected not to complete those programs.  Of the guards who did pursue training beyond orientation, all stated that they were compensated for time spent on the training or completed that training while performing other compensated work.  Thus, the court is aware of only one person, Ord, who claims to have completed a Securitas training program after the start of employment without receiving compensation.  Accordingly, plaintiffs have not made a modest factual showing that Ord's FLSA claim regarding training is similar to a claim that other Securitas employees in Pennsylvania could state.  Unlike the initial orientation program, there is no factual basis from which to infer that all, most, or even many Securitas employees in Pennsylvania were not compensated for participating in training after they were hired.

IV.

Plaintiffs also seek to certify a class of Pennsylvania employees who were required to perform uncompensated pre- and post-shift work.  As noted above, the FLSA requires employers to pay at least a specified minimum hourly wage for all work performed.  29 U.S.C. § 206.  The FLSA does not require employers to compensate non-exempt employees for de minimis quantities of

time spent working before and after shifts.  A Department of Labor regulation interpreting the FLSA states:

> In recording working time under the Act, insubstantial or insignificant periods of time beyond the scheduled working hours, which cannot as a practical administrative matter be precisely recorded for payroll purposes, may be disregarded.  The courts have held that such trifles are de minimis....  This rule applies only where there are uncertain and indefinite periods of time involved of a few seconds or minutes duration, and where the failure to count such time is due to considerations justified by industrial realities.  An employer may not arbitrarily fail to count as hours worked any part, however small, of the employee's fixed or regular working time or practically ascertainable period of time he is regularly required to spend on duties assigned to him.

29 C.F.R. § 785.47; see Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 692 (1946); De Asencio, 342 F.3d at 306.  In considering whether a particular task is de minimis, we analyze "(1) the practical administrative difficulty of recording the additional time; (2) the aggregate amount of compensable time; and (3) the regularity of the additional work."  De Asencio, 342 F.3d at 306.

In the declarations they submitted, plaintiffs Williams and Ord say, "While employed by Securitas, I regularly arrived at work early and performed job-related tasks like receiving pass down instructions, checking equipment and meeting with supervisors before my scheduled shift start-time.  I was not paid for any of this pre-shift work."  Plaintiff Devine states that he "worked before the start of [his] scheduled shift and was not

compensated."  Devine adds that he "received pass-down instructions and reviewed post orders before the start of [his] scheduled shift."  None of the plaintiffs identifies how much time he or she spent on these activities before shifts during a typical day, week, month, or year.  Plaintiffs' declarations also do not set forth whether this uncompensated pre-shift work occurred at each client location to which they were assigned or at only some of those locations.  Finally, none of the plaintiffs states that he or she preformed uncompensated post-shift work of any kind.

Other security guards' declarations state that the amount of time spent before and after shifts checking equipment, reading post orders, or conversing with other employees varies with the client location the employee is guarding.  At many locations, Securitas provides only one shift of guards per day.  Yet even client locations with "24/7" coverage do not require guards to relay "pass down" orders at each shift change.  When tasks such as relaying instructions, reviewing post orders, and checking equipment do occur, these activities typically occupy between a few seconds and two or three minutes.[2]

The basis of plaintiffs' own FLSA claims for unpaid pre- and post-shift work is unclear, preventing any meaningful comparison with other Pennsylvania security guards.  The tasks

---

2.  Securitas employees stated that these activities are often performed during their shifts while they are being paid, and not after or before their shifts.

plaintiffs claimed to have preformed without pay before their shifts consume plainly de minimis quantities of time and are not required on every shift or at every client location.  The plaintiffs' declarations do not contain any facts from which the court plausibly could draw different inferences.

Moreover, any FLSA claims that other members of the putative class may state for unpaid pre- and post-shift work would depend on the client locations to which each individual guard had been assigned.  As noted above, the declarations from non-plaintiff security guards reveal that only certain client locations require guards to relay "pass-down" orders, review standing orders, or check equipment.  Determining whether the putative class members were required or suffered to perform such tasks before and after their shifts would require the court to examine the working conditions, job requirements, and customary practices at hundreds of client sites from across the Commonwealth.[3]  All Securitas guards in Pennsylvania do not share the same conditions of employment, and we will not conditionally certify a collective action in such circumstances.  See Bamgbose, 684 F. Supp. 2d at 669; Bramble, 2011 U.S. Dist. LEXIS at *15.

---

3.  The plaintiffs' declarations do not say that they were required to perform uncompensated pre- and post-shift work at every location where they performed work for Securitas.  They also do not list specific client locations where such work occurred.  Accordingly, the court cannot merely limit the class to all Securitas employees who worked at certain clients' facilities.

V.

Finally, plaintiffs seek to certify conditionally a class of Pennsylvania Securitas employees who were required to spend time outside of work maintaining their uniforms in order to comply with Securitas' dress code.  Under federal regulations, the "cost of furnishing and maintaining" uniforms that an employer requires its employees to wear "is deemed to be a business expense of the employer and such cost may not be borne by the employees to the extent that to do so would reduce the employees' compensation below that required by the" FLSA.  29 C.F.R. § 4.168(b)(1).  This is not true, however, "where the uniforms furnished are made of 'wash and wear' materials which may be routinely washed and dried with other personal garments, and do not generally require daily washing, dry cleaning, commercial laundering, or any other special treatment."  Id. at § 4.168(b)(2).[4]  If employers provide their employees with such "wash and wear" uniforms, the Department of Labor interprets the FLSA as not requiring employees to be compensated for time spent maintaining the uniforms.  U.S. DEP'T OF LABOR, FIELD OPERATIONS HANDBOOK § 30c12(b)(5) (1988).  In adopting the regulation, the Department of Labor indicated it intended to harmonize the

---

4.  The Department of Labor regulation states that employers need not reimburse employees for maintaining uniforms that "do not generally require daily washing, dry cleaning, commercial laundering, or any other special treatment."  29 C.F.R. § 4.168(b).  The Department of Labor Field Operations Handbook purports to narrow this exception by adding that the employer also may not "require ironing."  U.S. DEP'T OF LABOR, FIELD OPERATIONS HANDBOOK § 30c12(b)(2) (1988) (emphasis in original).

requirement that employers bear the cost of caring for uniforms with the de minimis cost and time for employees to maintain "wash and wear" uniforms.  Wash-and-Wear Uniform Costs, 48 Fed. Reg. 49757 (Oct. 27, 1983).[5]

Based on the record, it is possible that Securitas told Pennsylvania employees they must iron their uniforms.  Undated Securitas training materials explain that "Items of personal attention relative to proper appearance and demeanor of Securitas officers include the following:  clean uniforms – neatly pressed."  Another passage in the same materials states that employees should consider "[t]he crispness of the uniform."  A second Securitas training document states uniforms should "be kept clean, unwrinkled and in good condition," which includes polished shoes.  This second document criticizes a cartoon of a Securitas employee for not wearing "a clean, pressed shirt."  Although the Securitas employee handbooks from 2006, 2008, and 2010 state only that uniform components must be "kept clean and

---

5.  The law governing FLSA claims for time spent maintaining employer-issued uniforms may be more complex than our discussion here suggests.  Courts considering facts very similar to those presented here have concluded that under the Portal-to-Portal Act, employers are not required by the FLSA to compensate security personnel for time spent maintaining uniforms.  See 29 U.S.C. § 254(a); Schwartz v. Victory Sec. Agency, LP, No. 11-489, 2011 WL 2437009, at *4-*5; Musticchi v. City of Little Rock, Ark., 734 F. Supp. 2d 631, 633-35 (E.D. Ark. 2010).  These cases do not consider the Department of Labor regulations.  Given the stage of the case and the conclusion we reach below, we find it unnecessary to reconcile the Department of Labor interpretation of the FLSA and the cases applying the Portal-to-Portal Act.

neat," employees exposed to these training materials may have concluded they were required to iron their uniforms.[6]

Plaintiffs have not made even a modest factual showing that all Securitas employees in Pennsylvania have similar claims for time spent maintaining their uniforms.  Securitas employees explain that they wear a variety of uniforms depending on the need of the particular client whose facility they are guarding.  Some clients require Securitas guards to wear a uniform referred to as a "military-style" uniform or alternately as a "hard look" uniform.  This uniform consists of a shirt, pants, "bomber"-style jacket, tie, and belt.  Other clients request Securitas guards wear a "lobby look" or "soft look" uniform, which consists of a shirt, pants, a blazer, and a tie.  Many, possibly all, of the elements in each style of uniform are "wash and wear," meaning that the employee may wash and dry those uniform elements in standard clothes washing machines and clothes dryers.  In addition to these two standard uniforms, some clients require Securitas guards to wear "non-standard" uniforms.  One example of a non-standard uniform referenced by an employee consisted of a polo shirt provided by either Securitas or the client, and black pants and black shoes supplied by the employee.  At some Securitas client sites, employees are not required to wear any

---

6.  Plaintiffs do not say whether they personally saw these training materials.  Given the conclusion we reach below, we ignore the possibility that no Securitas employee in Pennsylvania ever saw the training materials plaintiffs submitted with their motion.

uniform at all and wear instead their own business-casual clothing. The array of uniforms worn by Securitas personnel suggests that the time involved in cleaning those uniforms will vary from guard to guard.

Moreover, no one who submitted a declaration to the court, including the plaintiffs,[7] has stated that Securitas required uniforms to be ironed, commercially cleaned, or laundered with a particular frequency. Those guards who do iron their uniforms do so with differing levels of regularity. Some guards dry clean the "lobby look" blazer and the "military look" jacket, although others said they did not have those items cleaned commercially. The guards that do have the jacket or blazer cleaned professionally do so at varying intervals.[8] Based on the facts before the court, the frequency with which uniforms are cleaned and ironed is entrusted to the individual employee's discretion and, as a result, varies from employee to employee. Thus, the court simply cannot infer that Securitas employees have

---

7.  In their declarations, Williams and Ord say that they were "required to clean and maintain [their] uniform[s] pursuant to the Securitas dress code and uniform policies. [They] regularly washed and ironed some parts of [their] uniform[s] and took others to the cleaners." Notably, Williams and Ord do not say that ironing or dry cleaning of any article was required by the Securitas dress code and uniform policy or by any Securitas manager or supervisor. Plaintiff Devine states that he was required to clean and maintain the uniform he was given by Securitas, and that he cleaned and maintained it in accordance with Securtias' policies. Devine fails to state any actions he took to maintain his uniform in accordance with the policy.

8.  One guard reported washing his "lobby look" blazer at home, suggesting it also may be made of "wash and wear" material.

similar claims for uncompensated time spent maintaining Securitas uniforms.  Bamgbose, 684 F. Supp. 2d at 670.

VI.

Accordingly, we will grant the motion of plaintiffs to certify conditionally a collective action of all Securitas employees in Pennsylvania who attended the initial orientation program on an unpaid basis.  We will deny the motion in all other respects.